**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:       **JANICE WALKER,**          :          **Chapter 13**
                                          :
             **Debtor.**                  :
                                          :          **Bky. No.  10-12592 ELF**
                                          :

# O P I N I O N

## I.  INTRODUCTION

In this chapter 13 bankruptcy case, Debtor Janice Walker has filed an objection ("the

Objection") to the secured proof of claim ("the Proof of Claim") of the Certificateholders

CWALT, Inc., Alternative Loan Trust 2005-J14 Mortgage Pass Through Certificates ("the

Trust").  The Trust filed the Proof of Claim through its trustee, the Bank of New York Mellon

("BNYM").[1]

The Debtor's primary challenge to the validity of BNYM's claim is based on alleged

defects in the process by which the underlying mortgage loan was "securitized"[2] and became an

asset of the Trust.  The Debtor's contends that:

---

[1]       Throughout this Opinion, the references to BNYM are to that entity in its capacity as
trustee of the Trust.

[2]       Securitization is a process in which lenders transfer mortgage loans into a single pool or
trust and sell interests in that pool or trust to investors who receive certificates entitling them to share in
the stream of income generated by the repayment of the underlying loans.  See, e.g., In re Weisband, 427
B.R. 13, 21 (Bankr. D. Ariz. 2010) (citing Kurt Eggert, Held Up In Due Course: Predatory Lending,
Securitization, and the Holder in Due Course Doctrine, 35 Creighton L. Rev. 503, 536 (2002)); Bank of
New York v. Raftogianis, 13 A.3d 435, 441 (N.J. Super. Ct. 2010).  The transfer of the mortgages into
the pool and the creation of the securitized trust typically is memorialized in a document known as a
"pooling and servicing agreement."

(1) BNYM did not strictly comply with the pooling and servicing agreement ("the PSA") that governs the Trust and the Trust's acquisition of the note and mortgage on which the subject Proof of Claim is based;

(2) the failure to comply with the PSA deprives BNYM, in its capacity as trustee of the securitized trust, of the right to enforce the underlying loan note; and

(3) without the right to enforce the note, BNYM lacks a "right to payment," mandating that its proof of claim be disallowed.

As explained below, I conclude that:

(1) the underlying loan note is a negotiable instrument under Pennsylvania's version of article 3 of the Uniform Commercial Code;

(2) BNYM's right to enforce the note is governed by the Pennsylvania version of the Uniform Commercial Code, 13 Pa. C.S. §§1101-9710 ("the Pa. UCC"), and not exclusively by the PSA;

(3) BNYM has proven that it has the right to enforce the note under the Pa. UCC; and

(4) because, as the maker of the note, the Debtor has the right of "discharge by payment" under Pa. UCC §3602, the Debtor lacks standing to object to the Proof of Claim on the ground that the assignment of the note to BNYM was defective due to lack of compliance with the PSA.

Consequently, I will overrule the Objection.

## II. PROCEDURAL HISTORY

The Debtor commenced this chapter 13 bankruptcy case on March 31, 2010. The Debtor's proposed chapter 13 plan provides for the Debtor to make post-petition payments on her residential mortgage and to cure the pre-petition delinquency on the mortgage through her chapter 13 plan payments to the chapter 13 trustee. (Debtor's Amended Plan ¶¶5-6) (Doc. # 35). See 11 U.S.C. §1322(b)(5).[3]

---

[3]        The Debtor's proposed chapter 13 plan provides for the Debtor to make a total of
(continued...)

On September 17, 2010, BNYM filed a secured proof of claim in the amount of $264,855.72 ("the Proof of Claim").  BNYM filed the Proof of Claim through its agent, BAC Home Loans Servicing LP.  The Proof of Claim also stated that the pre-petition arrears are $31,703.63.

The Debtor filed the Objection to the Proof of Claim on November 16, 2010.  (Doc. #50).  After a number of continuances, a hearing on the Objection was scheduled on April 7, 2011.  Following a colloquy in which the parties and the court canvassed the legal and factual issues raised by the Debtor, BNYM requested the opportunity to file a motion for summary judgment.  See Fed. R. Bankr. P. 9014(c) (providing that Fed. R. Bankr. P. 7056, which incorporates Fed. R. Civ. P. 56, applies in contested matters).  I granted that request and entered an order setting deadlines for filing BNYM to file a  summary judgment motion ("the Motion") and the Debtor to respond.  (Doc. # 97).  BNYM subsequently filed the Motion, the Debtor responded and briefing was completed on July 22, 2011.

In her response to the Motion, the Debtor agreed there are no disputed issues of material fact and asserted that she is entitled to summary judgment disallowing the Proof of Claim.  As requested by the Debtor, I will treat her response as a cross-motion for summary judgment ("the Cross-Motion").  See, e.g., Western World Ins. Co. v. Reliance Ins. Co., 892 F. Supp. 659, 661 (M.D. Pa. 1995) (the weight of authority is that summary judgment may be granted in favor of a responding party even though the respondent has not filed formal cross-motion under Rule 56).

---

[3](...continued)
$77,349.40 in plan payments, $31,703.63 of which is for the cure of her pre-petition mortgage delinquency.

### III.  STATEMENT OF UNDISPUTED FACTS

1.  The Debtor is the owner of the residential real property located at 63 Buttonwood Drive
Exton, PA 19341 ("the Property").

2.  On August 31, 2005, the Debtor entered into a loan transaction ("the Loan") with Allied
Mortgage Group, Inc. ("Allied").

3.  The Debtor executed a note ("the Note") in the amount of $248,000.00 payable to Allied
(Ex. A).[4]

4.  The Note provides for the Debtor to repay the loan of $248,000.00 by making monthly
payments of $1,567.53 beginning on November 1, 2005 and ending on October 1, 2035.  (Id.
¶3).

5.  Paragraph 4 of the Note states that the Debtor may prepay principal at any time, but requires
the Debtor "to tell the Note Holder in writing that [she is] doing so."  (Id. ¶4)

6.  The Note also makes reference to an accompanying mortgage as follows:

> In addition to the protections given to the Note Holder under this Note, a
> Mortgage, Deed of Trust or Security Deed (the 'Security Instrument'), dated the
> same date as this Note, protects the Note Holder from possible losses which might
> result if I do not keep the promises which I make in this Note.  That Security
> Instrument describes how and under what conditions I may be required to make
> immediate payment in full of all amounts I owe under this Note.

(Id. ¶10).

7.  On August 31, 2005, in connection with the Loan, the Debtor also executed a mortgage on

---

[4]      All references to "exhibits" are to the exhibits attached to BNYM's Motion.  (Doc. #
101).  Certain exhibits were documents that were not accompanied by affidavits, thus raising a question
whether they may be considered in ruling on the Motion.  See Fed. R. Civ. P. 56(e)(1); Mincy v.
McConnell, 2011 WL 6337931, at *7 (W.D. Pa. Nov. 22, 2011).  However, because it is apparent from
the Debtor's response to the Motion that she does not question either the authenticity or admissibility of
the documents, I will consider all of the evidentiary matter BNYM attached to the Motion.

the Property in favor of Allied ("the Mortgage").  (Ex. B).

8.   The Mortgage provides, inter alia, that for purposes of securing repayment of the Note, the

Debtor granted a mortgage to MERS[5] (solely as nominee for Lender and Lender's successors

and assigns).  (Id., Transfers of Rights in Property).

9.   The last page of the Note contains an undated endorsement signed by Shantanu Roy

Chowdhury, as President of Allied, which states: "Pay to the Order of _____ Without

Recourse."  (Ex. A).

10.  BNYM is the Trustee of the Trust under a PSA dated November 1, 2005.  (See Ex. C).[6]

11.  In November 2005, Countrywide Home Loans Servicing, LP ("Countrywide"), acting in the

---

[5]      MERS is defined in the Mortgage as "Mortgage Electronic Registration Systems, Inc."

[6]      Recently, one bankruptcy court provided a concise summary of the nature of pooling and
servicing agreements as follows:

> [A] pooling and servicing agreement is an agreement creating a trust that defines
> the terms under which promissory notes and their related mortgages are placed
> into the trust, describes how the notes and mortgages and related loan documents
> are transferred by and between the parties to the trust, and sets forth the various
> responsibilities of the parties to the trust. The promissory notes, mortgages or
> deeds of trust, and related loan documents are the trust res. Through the
> securitization process, the beneficial or ownership interests in the trust are held
> by investors.
>
>                                       * * *
>
> [A] PSA also provides for the transfer of the mortgage loans to
> encompass various documents including the original note, original mortgage,
> original or certified copies of guaranties, mortgage assignments and other
> relevant documents  . . . .  Generally, the PSA provides that if certain documents
> are not in proper order after review by the Trustee of the Securitization Trust, the
> responsible party could be required to repurchase a mortgage loan.

In re Smoak, 461 B.R. 510, 515-16 (Bankr. S.D. Ohio 2011).

The PSA in this case appears to be consistent with the above description.

capacity as servicer of the Loan, purported to transfer the Loan into the Trust.[7] (Id.).

12. Pursuant to the PSA, Countrywide also was appointed as the "Master Servicer" on behalf of

the Trust.  (Id.).[8]

13. The PSA established a "Closing Date" of November 30, 2005.  (Id. at I-5).

14. The original Note has been in the possession or control of BNYM since January 6, 2006.

(Ex. G).[9]

15. On June 17, 2009, David Perez, Assistant Vice President of MERS, executed an Assignment

of Mortgage ("the Assignment"), transferring the Mortgage from MERS, as nominee for

Allied, to BNYM, as Trustee for the Trust.  The Assignment states that its effective date is

April 15, 2009.  (Ex. F).

16. The Assignment was recorded in the Office of the Chester County Recorder of Deeds on

July 8, 2009.  (Id.).

---

[7]        The identity of the entity holding the Note just prior to the purported transfer of the Loan into the Trust is not clear from the record.  However, the Loan appears to be listed on the Mortgage Loan Schedule designated as Schedule I of the PSA.

The Affidavit of BNYM's Vice President, Glenn Mitchell, (Ex. G), also addresses the subject briefly.  However, in referring to the transfer, Mr. Mitchell speaks in the passive voice, stating that the Note and the Mortgage "was [sic] deposited" into the Trust, with delivery made "by the servicer, Countrywide . . . ."  (Id.).  Mr. Mitchell's Affidavit does not explain on whose behalf Countrywide was acting.  While conceivably Countrywide could have delivered the Note in its capacity as Allied's agent, Allied does not appear to be a party to the PSA.  This suggests that Allied may have assigned the Note to some other entity before Countrywide delivered it to the Trust.

[8]        BNYM asserts, and the Debtor does not appear to dispute, that Countrywide Home Loans Servicing, LP is now known as BAC Home Loan Servicing, LP ("BAC").  BAC is the entity that filed the Proof of Claim, as agent for BNYM.

[9]        In his Affidavit, Mr. Mitchell states that "the original Note has been in [BNYM's] possession and/or control since January 6, 2006, and . . . [was] delivered to [BNYM] by the servicer, Countrywide Home Loans Servicing, L.P."  (Id., Ex. G).

17. The Debtor commenced this chapter 13 bankruptcy case on March 31, 2010.

18. In both Schedule D of her bankruptcy schedules and in her amended chapter 13 plan filed on October 11, 2010, the Debtor identified the creditor holding the mortgage on the Property as "Countrywide Home Lending." (Doc. #'s 1, 35).

## IV.  LEGAL STANDARD ON SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The standard for evaluating a summary judgment motion is well established and has been stated in numerous written opinions in this district.[10]

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts that, if proven at trial, would require a directed verdict in favor of the movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986). Such evidence must be sufficient to support a factfinder's factual determination in favor of the nonmoving party. Id.

---

[10]    E.g., In re Frey Mechanical Group, Inc., 446 B.R. 208, 213-14 (Bankr. E.D. Pa. 2011) (per Coleman, J.); In re Lilly, 2006 WL 3859128, at *2 (Bankr. E.D. Pa. Oct. 27, 2006) (per FitzSimon, J.); In re Klayman, 333 B.R. 695, 698-99 (Bankr. E.D. Pa. 2005) (per Raslavich, J.); In re Lacheen, 2005 WL 1155257, at *2 (Bankr. E.D. Pa. Apr. 28, 2005) (per Sigmund, J.); In re Lewis, 290 B.R. 541, 545 (Bankr. E.D. Pa. 2003) (per Carey, J.); In re Newman, 304 B.R. 188, 192-93 (Bankr. E.D. Pa. 2002) (per Fox, J.).

Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In considering the evidentiary matter submitted in support of and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. Anderson, 477 U.S. at 247-50. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Id. at 248. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. U.S. v. 717 S. Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).

The parties' respective burdens of proof also play a role in determining the merits of a summary judgment motion.

> [W]here the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but . . . this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. In contrast, where . . . "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992).

Newman, 304 B.R. at 193 (quoting Adams v. Consol. Rail Corp., 1994 WL 383633, at *1 (E.D. Pa. July 22, 1994)).

Thus, as the party with the burden of proof, BNYM must show that there are no material facts in dispute, that the undisputed facts satisfy each element of its claim and that the evidence is such that no reasonable factfinder would disbelieve it. For the Debtor to prevail on the Cross-Motion, she must demonstrate that (1) material facts are not in dispute and that she is entitled to judgment as a matter of law in that the undisputed facts negate at least one element of BNYM's

claim or (2) BNYM has not come forward with sufficient support at least one element of its claim.  See, e.g., Newman, 304 B.R. at 194.

## V.  DISCUSSION

### A. Overview

The Debtor does not deny that she is obligated to repay the Note she signed when she entered into the mortgage loan transaction with Allied in 2005.  Nor does she contest the amount of either the total secured claim or the pre-petition arrears stated in the Proof of Claim. Nevertheless, she objects to BNYM's claim because she asserts that the Trust is not the party to whom she is obliged to pay under the Note, i.e., she disputes the Trust's right to enforce her repayment obligation under the Note.  In effect, she contends that BNYM is not her "true" creditor.[11]

The Debtor's argument is premised on the general, indisputable proposition that for a creditor to have an allowable claim in a bankruptcy case (be it secured or unsecured), the creditor must have a "right to payment."  See 11 U.S.C. §101(5)(a); see also FCC v. Nextwave Pers. Communs., Inc., 537 U.S. 293, 303 (2003) (the "plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation" (quoting Pennsylvania Dep't. of Pub. Welfare v. Davenport, 495 U.S. 552, 559 (1990))).  Thus, 11 U.S.C. §502(b)(1) requires the court to

---

[11]        In objecting to BNYM's claim, the Debtor presumably believes that some other entity holds the right to enforce the Note.  The Debtor has not attempted to harmonize the Objection to BNYM's claim with the terms of her chapter 13 plan, which is designed to permit her to cure her pre-petition mortgage delinquency.  See n. 3, supra.  Considering that the cure of her pre-petition mortgage default was likely the primary reason she filed this chapter 13 bankruptcy case, if the Objection to BNYM's Proof of Claim were sustained, one might well wonder what purpose the bankruptcy filing serves.

disallow a claim to the extent that it is "unenforceable against the debtor . . . under any agreement

or applicable law for a reason other than because such claim is contingent or unmatured."

The Debtor's challenge to the Proof of Claim focuses on BNYM's rights under the

Note, not the Mortgage.  The Debtor contends that BNYM has not established that it has "an

enforceable interest in the [N]ote." (Debtor's Memorandum of Law at 4 (unpaginated)).[12]  Thus,

properly understood, in this contested matter, the Debtor disputes the right of a record mortgagee

to assert a bankruptcy claim, i.e., a right to payment, based on an asserted defect relating to

BNYM's right to enforce the Note that is secured by the mortgage.[13]

---

[12]      Throughout her submissions, the Debtor frames this argument as involving BNYM's
lack of "standing."  (See Id., Debtor's Sur-Reply at 8, 11).  This is not surprising as many courts have
analyzed the issue in those terms.  See, e.g., In re Miller, 2012 WL 286865 (10th Cir. Feb.1, 2012).
However, I question whether the Debtor's Objection should be conceptualized as one raising BNYM's
lack of standing.

Because the parties' dispute centers not on whether an obligation is owed, but on
whether the correct party is seeking to enforce the obligation, it may be difficult to distinguish between
"standing" and a defense on the merits of the claim.  For a party to have standing to be heard in a
bankruptcy proceeding, it "must have some legally protected interest that either has been adversely
affected (thereby warranting judicial relief) or that is in actual danger of being adversely affected (if
relief is not granted)."  In re Alcide, 450 B.R. 526, 535 (Bankr. E.D. Pa. 2011) (citing In re Global Indus.
Techs., Inc., 645 F.3d 201, 210-11 (3d Cir. 2011)).  In addition there is an "inherent . . . additional
requirement that the party must be asserting its own rights and not that of another entity."  Id. (citing In re
Martinez, 2011 Bankr. LEXIS 982, at *4 (Bankr. D. Wyo. Mar. 16, 2011) and Storino v. Borough of
Point Pleasant Beach, 322 F.3d 293, 298-99 (3d Cir.2003)).

BNYM is the mortgagee of record with respect to the Property that secures the Note and
has possession of the underlying Note.  See Findings of Fact Nos. 14-16.  While BNYM's claim is
subject to defenses the Debtor might raise, it seems intuitive that BNYM has standing to be heard on the
merits.

In any event, it is doubtful that the different ways of characterizing the issue have any
practical consequences in this contested matter.  However the Debtor's arguments are characterized, as
explained below, I find them to be without merit.

[13]      I note that certain issues that arise with some regularity in mortgagor-mortgagee
litigation are not presented here.  For example, while the Debtor disputes the validity of the assignment
of the Note to BNYM, she does not question the MERS' authority to assign the Mortgage.  See, e.g.,
(continued...)

-10-

The Debtor makes two (2) arguments in support of the Objection.

First, the Debtor contends that, assuming the Pa. UCC is applicable, BNYM has not

established under the UCC that it is the party with the right to enforce the Note.

The Debtor devotes the most effort in her submissions to her second, far more

sophisticated argument: that irrespective of the Pa. UCC or other applicable law, the PSA and

New York trust law governs BNYM's rights in the Note and that application of New York law

and the PSA compels the conclusion that BNYM does not have any rights under the Note.

---

[13](...continued)

Culhane v. Aurora Services of Nebraska, 2011 WL 5925525, at *12-17 (D. Mass. Nov. 28, 2011)
(discussing MERS' powers to assign and enforce mortgage loan); Raftogianis, 13 A.3d at 440-41 & 447-
50 (same). Nor does the Debtor base her objection on the fact that the Note was purportedly transferred
to the Trust in 2005 while the Mortgage remained in the names of Allied and MERS (as nominee) prior
to MERS' execution of the Assignment in June 2009. Both of these arguments, if meritorious, lead to the
further arguments that the Note and the Mortgage were "split."

The concept of "splitting" the note and the mortgage, and the consequences thereof, have
been discussed by numerous courts and commentators. See, e.g., In re Veal, 450 B.R. 897, 915 (B.A.P.
9th Cir. 2011) (referring to common law rule that transfer of mortgage without transfer of obligation it
secures renders mortgage ineffective and unenforceable in hands of transferee); Culhane, 2011 WL
5925525, at *7-12 (under Massachusetts law, transfer of note does not automatically transfer mortgage
with it, unified ownership of mortgage and right to enforce underlying note must exist in order to
foreclose); In re Mims, 438 B.R. 52, 56 (Bankr. S.D.N.Y. 2010) (same principle under New York law);
In re Dolata, 306 B.R. 97, 131 (Bankr. W.D. Pa. 2004) (stating that in Pennsylvania, production of
accompanying bond or note, as matter of law, is not essential to mortgagee's right of action on
mortgage); Raftogianis, 13 A.3d at 447-50; Restatement (Third) of Property, Mortgages §5.4(a), (b)
(absent contrary intent of parties, transfer of note secured by mortgage also transfers mortgage and
transfer of mortgage securing note also transfers note); id. comment a. ("When the right of enforcement
of the note and the mortgage are split, the note becomes, as a practical matter, unsecured"); Report of the
Permanent Editorial Board For the Uniform Commercial Code, Application of the Uniform Commercial
Code to Selected Issues Relating to Mortgage Notes at 8, 12 (Nov. 14, 2011) (Article 9 of the UCC
governs the sale of negotiable and non-negotiable promissory notes and assignment of the note
automatically transfers a corresponding interest in the mortgage) (citing UCC §§9-109(a)(3); 9-203(g)),
http://www.ali.org/00021333/PEB%20Report%20-%20November%202011.pdf, ("2011 UCC Ed. Bd.
Report").

I express no opinion on these issues.

### B. BNYM's Right to Enforce the Note Under the Pa. UCC

Assuming <u>arguendo</u> that the Pa. UCC applies (an issue to which I will return and address "head-on" in Part V.C.2 and 3, below), the Debtor asserts that the Proof of Claim included "no attachment . . . demonstrat[ing] where, how or when the original note was ever transferred from Allied . . . to the Trust." (Objection ¶8). Thus, the Debtor questions whether BNYM has presented sufficient evidence to support its right to enforce the Note under applicable principles of contract law.

I begin with this argument, in part, because it is familiar. This type of objection has been raised with some frequency by debtors in recent years, particularly after the New Jersey bankruptcy court's decision in <u>In re Kemp</u>, 440 B.R. 624 (Bankr. D.N.J. 2010). In <u>Kemp</u>, the court sustained a debtor's objection to a secured proof of claim filed by the trustee of a securitized trust because claimant failed to satisfy the indorsement element for negotiation of the underlying note under New Jersey's version of Uniform Commercial Code and thus, did not attain the status as a "holder" entitled to enforce note. More recently, the relevant legal principles governing a purported note holder's right to enforce a note and assert a claim in a bankruptcy case were analyzed in depth in the 9th Circuit Bankruptcy Appellate Panel decision in <u>Veal</u>.[14]

The following UCC principles may be distilled from <u>Veal</u> and <u>Kemp</u>:

- the borrower's obligation is to pay the person entitled to enforce the note (who need not be the "owner" of the note);[15]

---

[14]   Another excellent discussion on the subject may be found in <u>Raftogianis</u>, 13 A.3d at 438-40.

[15]   <u>See</u> Comment, Pa. UCC §3203; Pa. UCC §3412.

(continued...)

- if the borrower pays a "person entitled to enforce" the note, the borrower's obligations are discharged to the extent of the amount paid;[16]

- there are three ways in which a person may qualify as the person to enforce the note:[17]

  - first, by being its holder (i.e., in possession of the note where the note is payable to the person or is payable to bearer);[18]

  - second, by being a nonholder in possession who has the rights of a holder;[19]

  - third, if the note has been destroyed or is lost or is in the wrongful possession of an unknown person or a person that cannot be found, by establishing that the person was formerly in possession of the note with the right to enforce when the loss of possession occurred (and the loss was not a result of a transfer of lawful seizure).[20]

See Veal, 450 B.R. at 910-13; Kemp, 440 B.R. at 630-34; see also 2011 UCC Ed. Bd. Report at 4-7.

In this case, BNYM has come forward with undisputed evidence that Allied endorsed the Note in blank without recourse and that BNYM has possession of the Note.  See Finding of Fact

---

[15](...continued)

[16]      Pa. UCC §3602(a).

[17]      See Pa. UCC §3301.

[18]      See Pa. UCC §1201 (definition of "holder"), §3201 (manner of negotiation).  "This determination requires physical examination not only of the face of the note but also of any indorsements."  Veal, 450 B.R. at 911.

[19]      See Pa. UCC §§3203, 3301(2).  This method of becoming a person with a right to enforce a note arises when a party obtains possession of a note by means of a "transfer," rather than a "negotiation."  See Veal, 450 B.R. at 911 (comparing UCC § 3–201 (definition of negotiation) with UCC § 3–203(a) (definition of transfer)).

[20]      See Pa. UCC §3309.

No. 14 & n.9 thereto.[21]  As the indorsement is neither payable to an identified person or to the

bearer, it is not a "special indorsement."  Pa. UCC §3205(a).  Rather, it is a "blank indorsement"

and, as such, the Note is "payable to bearer and may be negotiated by transfer of possession alone

until specially indorsed."  Pa. UCC §3205(b).  As a result of the negotiation in this fashion, and

by virtue of its possession of the Note, BNYM is the holder of the Note.  See Pa. UCC §3201(a).

As the holder, BNYM is the person entitled to enforce the Note.  Pa. UCC §3301(1).

    In response to this analysis, the Debtor makes only a half-hearted argument, contending

that "[p]roduction of an original note at trial does not, in itself, establish that the note was

transferred to the party . . . with the purpose of giving that party the right to enforce that

instrument."  (Debtor's Mem. of Law at 4 (unpaginated)).  The only authority the Debtor cites for

this proposition is the North Carolina Court of Appeals decision in Simpson.

    The Debtor has taken the Simpson court's statement regarding proof of the right to

enforce a promissory note out of context.  In Simpson, the court denied the plaintiff's request to

foreclose on real property based on an asserted default under the note and concluded that the

plaintiff's possession of the note, by itself, did not establish its status as the holder.  However, the

court reached that result because the note in question "was not indorsed to [the plaintiff] or to

bearer," 711 S.E.2d at 172,  reasoning that "[m]ere possession of a note by a party to whom the

note has neither been indorsed nor made payable does not suffice to prove ownership or holder

status," id. (quoting In re Adams, 693 S.E.2d 705, 710 (N.C. Ct. App. 2010)) (internal quotations

---

[21]        BNYM also represents (and the Debtor does not dispute) that it made the original Note
available for the Debtor's inspection.  (See BNYM Reply Memorandum at 7) ("the Debtor does not deny
that her counsel personally inspected the Collateral File which was presented at the April 7, 2011 hearing
and witnessed that it contained the original "wet ink signature" of the Debtor on both the Mortgage and
Note.").

omitted).

The outcome in <u>Simpson</u> turned on the absence of an indorsement.  Unlike the plaintiff in
<u>Simpson</u>, BNYM has established its possession of the Note, endorsed in blank.  This factual
difference renders <u>Simpson</u> inapposite.

Based on this record, I conclude that, insofar as BNYM's rights are measured under the
Pa. UCC, BNYM has the right to enforce the Note and, therefore, holds an allowable bankruptcy
claim.

### C.  The PSA Issues

### 1. the Debtor's argument

Undoubtedly recognizing the weakness of her argument under the Pa. UCC, the Debtor's
attempts an "end-run" around the Pa. UCC.  Simply put, the Debtor contends that the  the PSA
and New York law, and not the Pa. UCC,  is the source of law that should be consulted in
evaluating BNYM's rights under the Note.  The Debtor offers two justifications for this position:
(1) the Note is not a negotiable instrument under Pa. UCC §3104;[22] and (2) even if it is a
negotiable instrument, the parties intended BNYM's rights be determined under the PSA and
New York law.

Based on the foundational premise that the PSA and New York law, rather than the Pa.
UCC, control, the Debtor then asserts that the transfer of the Note to BNYM was not carried out
in conformity with the requirements of the PSA, and that the lack of compliance with the PSA

---

[22]        Presumably, the Debtor believes that if the Note is not a negotiable instrument, article 3
of the Pa. UCC does not apply.

requires the disallowance of the Proof of Claim.  Stated concisely, the Debtor contends that the

Trust "never has, and never can own [the Note and that] . . . [by] violating its own Pooling and

Service Agreement, [the Trust] has prevented itself from ever having an enforceable right to [the

Note and the Mortgage].  (Debtor's Mem. of Law at 3-4 (unpaginated)).

The Debtor reasons as follows:

> (1) the PSA is the document that established the Trust;
>
> (2) the Trust is governed by New York law;[23]
>
> (3) for an asset to become an asset of the Trust it must have been transferred to the Trust in conformity with the requirements of the PSA;
>
> (4) the PSA provides the <u>only</u> manner in which assets may be transferred to the Trust;
>
> (5) the Trust received possession of the indorsed Note no earlier January 6, 2009, <u>see</u> Finding of Fact No. 13, thirty-seven (37) days after the Trust's "closing date;"
>
> (6) due to the tardy delivery of the Note to the Trust, the Note was not transferred to the Trust in compliance with the PSA, rendering the purported transfer ineffective under applicable New York law.

As explained below, I conclude that this argument fails because:

> (1) the Note is a negotiable instrument, vitiating the Debtor's initial and essential premise (<u>i.e.</u>, that the Pa. UCC does not control);
>
> (3) the Debtor has presented no evidence supporting her theory that the parties to the PSA intended the PSA to supplant entirely the UCC;
>
> (3) under the Pa UCC, the Debtor's payment to BNYM as the holder of the Note satisfies the Debtor's obligations under the Note;

---

[23]     Section 10.03 of the PSA states: "This Agreement shall be construed in accordance with and governed by the substantive law of the State of New York applicable to agreements made and to be performed in the State of New York . . . ."  (Ex. C).

-16-

(4) it is therefore, irrelevant to the Debtor whether the parties to the PSA
complied with its requirements in connection with the assignment of the Note
to the Trust, as a result of which, the Debtor lacks standing to question the
validity of the transfer of the Note to the Trust under the PSA.

## 2. the Note is a negotiable instrument

The term "negotiable instrument" is defined in Pa UCC §3104.[24]  There is abundant legal

authority for the proposition that mortgage notes, such as the one involved in this matter, are

negotiable instruments governed by article 3 of the UCC.  See, e.g., In re Carmichael, 448 B.R.

690, 693-94  (Bankr. E.D. Pa. 2011) (collecting cases); see also In re AppOnline.com, Inc., 321

B.R. 614, 621-24 (E.D.N.Y. 2003), aff'd on other grounds, 128 F. App'x 171 (2d Cir. 2005); J.S.

Judge & Co. v. Lilley, 28 Pa. D&C. 3 (Phila. Mun. Ct. 1937).

In her initial Memorandum, the Debtor appears to assume that the Pa. UCC governs the

analysis.[25]  However, in her Sur-Reply Memorandum, the Debtor questions, for the first time,

---

[24]     Pa UCC §3104 defines a "negotiable instrument" as an

unconditional promise or order to pay a fixed amount of money, with or without
interest or other charges described in the promise or order, if it:

(1)     is payable to bearer or to order at the time it is issued or first comes into
possession of a holder;

(2)     is payable on demand or at a definite time; and

(3)     does not state any other undertaking or instruction by the person
promising or ordering payment to do any act in addition to the payment
of money.

See also Pa. UCC §3106(a) (1)-(3) (defining the meaning of "unconditional promise or order").

[25]     The Debtor does not address the issue directly in the Memorandum.  However, in
support of her position that BNYM has not established its right to enforce the Note, she cites Simpson,
the case discussed above in Part V.B.  The point here is that in asserting that BNYM had not established

(continued...)

whether the Note is a negotiable instrument under Article 3 (and, presumably whether Article 3

even applies).  (Debtor's Sur-Reply Memorandum at 5-7). [26]

In making this argument, the Debtor does not dispute that the Note satisfies the

requirements of Pa UCC §3104(a)(1) and (2).  Her position is based entirely on

> (1) the requirement in Pa UCC §3104(a)(3) that the Note impose no obligation or
> undertaking on the Debtor other than the payment of money, and

> (2) Paragraph 4 of the Note, which provides that in the event the Debtor makes a
> prepayment of principal (which is authorized by the Note), the Debtor must
> "tell the Note Holder in writing that [she is] doing so."  (Ex. A).

The Debtor asserts that her non-monetary obligation to give the note holder notice of a

prepayment of principal strips the Note of its status as a negotiable instrument.  She cites no

authority in support of her argument except for two (2) law review articles.  See Dale A.

Whitman, How Negotiability Has Fouled up the Secondary Mortgage Market, and What to Do

About It, 37 Pepp. L. Rev. 737, 749-51 (2010); Ronald J. Mann, Searching for Negotiability in

Payment and Credit Systems, 44 UCLA L. Rev. 951, 969-73 (1997).

There is no binding precedent on this issue.  Indeed, there is very little case law at all.  In

my research, I have found only three (3) reported decisions.  All three of them reject the Debtor's

---

[25](...continued)
its right to enforce the Note, the Debtor cited a case decided under the North Carolina version of the
UCC.

[26]        The Debtor presents a somewhat surprising discourse on the subject, arguing both for
and against negotiability, under the heading: "Debtor's Note May or May Not Be Negotiable Under
Pennsylvania Law and That is Why the Trust Opts for Uniform Conveyance Terms under the PSA, not
the U.C.C."  (Id. at 5).  Notwithstanding the Debtor's equivocation, I interpret the Debtor's submission as
disputing that the Note is a negotiable instrument because that position is essential to the merits of her
Objection to BNYM's Proof of Claim.

position.  See Picatinny Fed. Credit Union v. Fed, National Mortgage Assoc., 2011 WL 1337507,

at *7 (D.N.J. Apr. 7, 2011); In re Edwards, 2011 WL 6754073, at *5 (Bankr. E.D. Wis. Dec. 23,

2011); HSBC Bank USA, N.A. v. Gouda, 2010 WL 5128666, at *2-3 (N.J. Super. App. Div.

Dec. 17, 2010).

The most fulsome explanation for the courts' holdings is provided by Gouda:

> The right of defendants, under the note, to prepay part of the principal does
> not constitute an "additional undertaking or instruction" that adversely affects the
> negotiability of the note. Quite the opposite, the right of prepayment is a voluntary
> option that defendants may elect to exercise solely at their discretion. Indeed, such
> an allowance confers a benefit, not a burden, upon defendants, who can freely
> choose to decline the opportunity. The fact that defendants must notify the lender
> in the event they opt for prepayment imposes no additional liability on them and is
> not a condition placed on defendants' promise to pay. Rather, notification is
> simply a requirement of the exercise of the right of prepayment which, as noted,
> defendants are free to reject. This requirement does not render the note in issue
> non-negotiable.

2010 WL 5128666, at *3 (emphasis added).

I find the Gouda court's analysis of the issue persuasive and I will follow its holding.

Therefore, I reject the Debtor's sole ground for her contention that the Note is not a negotiable

instrument.  It follows from this conclusion that the Pa. UCC is presumptively the appropriate

source of law to consult in determining the respective rights of the Debtor and BNYM under the

Note.

### 3.  the PSA does not supersede the UCC

The Debtor contends that even if the Note is a negotiable instrument, the parties to the

PSA intended the PSA to be exclusive source of law for determining whether BNYM has the

right to enforce the Note.  The Debtor posits that notwithstanding the fact that the Note, on its

face, is a negotiable instrument governed by article 3 of the UCC, the UCC's provisions

regarding negotiability have been superseded by the PSA.  While the Debtor does not phrase it in

these terms, in effect, she contends that the PSA "occupies the field" to the exclusion of the

UCC.

   As one court has pointed out, while the provisions of the UCC simply serve as "default

rules" which may be varied by contract, see Pa. UCC §1102(c), there are limits to this principle.

In particular, the UCC does not permit contracting parties to "vary" the provision governing the

definition of negotiable instruments and their negotiation.  Smoak, 461 B.R. 510, 521 (citing

Comment 2, UCC 1-102).  However, I need not base my decision on that ground.  Even if the

wholesale replacement of the UCC by agreement of the parties were permissible, the Debtor has

made no factual showing to support the conclusion that the parties to the PSA intended such a

dramatic, perhaps even counterintuitive, result.  The far more intuitive inference is that the

parties participating in the assignment of the Note to the Trust intended to rely on the Note's

status as a negotiable instrument, along with the well-established body of commercial law that

accompanies that status, as the source of law for determining their respective rights.  Some

evidentiary showing would be necessary to convince me otherwise, but there is no such record in

this matter.

   Furthermore, the Debtor overlooks the fact that the Note's status as a negotiable

instrument was established at the outset of the transaction – when the Debtor executed the Note

in favor of Allied – long before the assignment of the Note to the Trust.  It therefore is difficult to

understand how a later agreement (the PSA) – to which the Debtor is not a party – could alter the

nature of the contract and instrument she executed years earlier.[27]  Consequently, I conclude that

while the PSA may have some effect on the rights of BNYM, it does not render the UCC

completely irrelevant.  And, as explained in the next section of this Opinion, once one accepts

the continued relevance of the UCC, that statute bestows certain rights on the Debtor which have

the effect of depriving the Debtor of standing to object to BNYM's Proof of Claim.


### 4.  due to Pa UCC §3602(b), the Debtor lacks standing to question the validity of the assignment of the Note to BNYM based on alleged violations of the PSA

In the past two (2) years, numerous courts have held that a borrower lacks standing to

challenge a securitized trust's authority to enforce a loan note and mortgage based on purported

violations of the underlying PSA.  Most of the reported decisions arise in cases in which the

borrower initiated a lawsuit against the mortgagee seeking a determination that it lacked

authority to enforce the subject note and mortgage or wrongfully foreclosed on the mortgage.[28]

---

[27]        The significance of this point is highlighted in the next section of this Opinion in which I
point out that the UCC accords certain protections to the Debtor as the maker of the negotiable
instrument.

[28]        See Estate of Malloy v. P.C. Bank, 2012 WL 176143 (E.D. Mich. Jan. 23, 2012);
Lindsay v. America's Wholesale Lender, 2012 WL 83475 (C.D. Cal. Jan. 10, 2012); Peterson v.
Carrington Morag. Services, LLC, 2011 WL 6934551 (Cal. Ct. App. Dec. 28, 2011); Bubo v. Bank of
New York Mellon, 2011 WL 6011787 (D. Haw. Nov. 30, 2011); Juarez v. U.S. Bank Nat. Ass't ex rel.
Holders of the Asset Backed Securities Corp. Home Equity Loan Trust, Series NC 2005-HE8, 2011 WL
5330465 (D. Mass. Nov. 4, 2011); Cooper v. Bank of New York Mellon, 2011 WL 5506087 (D. Haw.
Oct. 25, 2011); Long v. One West Bank, FSB, 2011 WL 3796887 (N.D. Ill. Aug. 24, 2011) (alternative
holding); Dersch v. BAC Home Loan Servicing LP, 2011 WL 3100561 (W.D. Mich. July 25, 2011);
Bascos v. Federal Home Loan Morag. Corp., 2011 WL 3157063 (C.D. Cal. July 22, 2011); Anderson v.
Countrywide Home Loans, 2011 WL 1627945 (D. Minn. Apr. 8, 2011); Bittinger v. Wells Fargo Bank
NA, 744 F. Supp. 2d 619 (S.D. Tex. 2010); Bridge v. Aames Capital Corp., 2010 WL 3834059 (N.D.
Ohio Sept. 29, 2010); Greene v. Home Loan Services, Inc., 2010 WL 3749243 (D. Minn. Sept. 21, 2010);
Livonia Prop. Holdings, L.L.C. v. 12840-12976 Farmington Rd. Holdings, L.L.C. 717 F. Supp. 2d
(continued...)

Other decisions emanate from bankruptcy proceedings in which the debtor either initiated

affirmative adversary proceedings against the mortgagee raising similar claims, objected to the

mortgagee's proof of claim, or challenged the mortgagee's right to seek relief from the automatic

stay.[29]  Whatever the context, it appears that a judicial consensus has developed holding that a

borrower lacks standing to (1) challenge the validity of a mortgage securitization or (2) request a

judicial determination that a loan assignment is invalid due to noncompliance with a pooling and

servicing agreement, when the borrower is neither a party to nor a third party beneficiary of the

securitization agreement, i.e., the PSA.  See, e.g., Lindsay, 2012 WL 83475, at *3.

    In this case, based on the facts before me, I come to the same conclusion.  Because the

Note is a negotiable instrument and that BNYM is the holder the instrument, the Debtor lacks

standing to assert that BNYM cannot enforce the Note due to an alleged failure to comply with

the PSA.

    The threshold inquiry in analyzing a party's standing is to evaluate whether the party can

demonstrate that the party has suffered or will suffer "injury in fact."  E.g., Doe ex rel. Doe v.

Lower Merion Schol District, 665 F.3d 524, 542 (3d Cir. 2011; Global Indus. Techs., 645 F.3d at

---

[28](...continued)
724 (E.D. Mich.), aff'd 399 F. App'x 97 (6th Cir. 2010).  But see Rose v. Mortgage Elec. Systems, Inc.,
2011 WL 5223349 (D. Mass. Sept. 29, 2011).

[29]     In re Correia, 452 B.R. 319 (B.A.P. 1st Cir. 2011); In re Wright, 2012 WL 27500 (Bankr.
D. Haw. Jan. 5, 2012); In re Edwards, 2011 WL 6754073 (Bankr. E.D. Wis. Dec. 23, 2011); In re
Washington, 2011 WL 6010247 (Bankr. W.D. Mo. Dec. 1, 2011); Smoak; In re Tarantola, 2010 WL
3022038 (Bankr. D. Ariz. July 29, 2010); In re Almeida, 417 B.R. 140 (Bankr. D. Mass. 2009); see also
In re D'Angelo, 2012 WL 27541 (Bankr. E.D. Pa. Jan. 5, 2012) (noting case law on the subject); In re
Simmerman, 2011 WL 6091731 (Bankr. S.D. Ohio Dec. 7, 2011) (finding debtor had standing because
they challenged mortgagee's authority to enforce note under UCC as well as PSA).

210.  If a borrower cannot demonstrate potential injury from the enforcement of the note and

mortgage by a party acting under a defective assignment, the borrower lacks standing to raise the

issue.  See Livonia Prop. Holdings, 717 F. Supp. 2d at 737 (citing Nicolls Pointing Coulson, Ltd.

v. Transp. Underwriters of La., Inc., 777 F. Supp. 493 (E.D. La.1991)).

Here, the element of "injury in fact" is lacking because the Note is a negotiable

instrument and BNYM is the holder.  As a result, even if the assignment to BNYM were

defective and the original assignor retains ownership rights in the Note, any payments the Debtor

makes to BNYM will discharge her liability under the Note.  See Pa UCC §3602(a) (subject to

certain exceptions that are not applicable here, "[t]o the extent of the payment, the obligation of

the party obliged to pay the instrument is discharged even though payment is made with

knowledge of a claim to the instrument under section 3306 (relating to claims to an instrument)

by another person").

Due to Pa. UCC 3602(a), the Debtor is in no danger of being subjected to double liability.

Even if, as a result of a failure to comply with all of the transfer requirements of the PSA (or for

any other reason), BNYM  lacks the right to retain the economic benefit of the Note, BNYM is

the holder and the Debtor cannot be harmed by paying the holder.  In short, the Debtor is

unaffected by any noncompliance with the PSA.  Consequently, the Debtor lacks standing to

contest the validity of the assignment of the Note to BNYM on the ground that BNYM failed to

comply with the requirements under the PSA.

As the court in Smoak concisely stated, "the PSA does not relate to who is the 'person

entitled to enforce' the Note under the . . . UCC."  Smoak, 461 B.R. at 519.  In a case involving a

securitized mortgage note that is a negotiable instrument under the UCC, the argument that lack

of compliance with the PSA vitiates an otherwise allowable claim,

> confuses the rights of an owner of a promissory note or one who holds interests in a promissory note with the rights of a holder of a note. [The] argument suggests that in order to prove standing to file and enforce a proof of claim relating to a securitized mortgage note, a creditor must establish that it is the owner of the note — not the holder of the note. However, as noted, under [the UCC], it is the holder of a promissory note who may enforce it and who, therefore, has standing to file a proof of claim.

Id. at 522.

Further, as the court observed in Veal, under the UCC,

> the rules that determine who is entitled to enforce a note are concerned primarily with the maker of the note. They are designed to provide for the maker a relatively simple way of determining to whom the obligation is owed and, thus, whom the maker must pay in order to avoid defaulting on the obligation. UCC § 3–602(a), (c). By contrast, the rules concerning transfer of ownership and other interests in a note identify who, among competing claimants, is entitled to the note's economic value
> . . . . **Under established rules, the maker should be indifferent as to who owns or has an interest in the note so long as it does not affect the maker's ability to make payments on the note**.

450 B.R. at 912 (emphasis added) (footnote omitted).


## VI.  CONCLUSION

For the reasons set forth above, I conclude that because the underlying source of BNYM's right to payment (the Note) is a negotiable instrument and BNYM is the holder of the Note, the Debtor lacks standing to object to BNYM's Proof of Claim on the ground that BNYM failed to comply with all of the requirements of the PSA.  As the party with the right to enforce the Note, BNYM has a right to payment that is an allowable bankruptcy claim, regardless of whether BNYM is the party ultimately entitled to the economic benefit of the Debtor's repayment of the Note.  As the Debtor has raised no other basis for disallowing the Proof of Claim, the Objection will be overruled.

An order consistent with this Opinion will be entered.


**Date:  February 13, 2012**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**